UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| GARY BLOODSAW, | ) |
| Plaintiff, | ) )  ) |
| | ) 1:12-cv-426 |
| v. | ) |
| | ) Judge Curtis L. Collier |
| HAMILTON COUNTY BOARD OF EDUCATION, | ) ) |
| | ) |
| Defendant. | ) |

## **M E M O R A N D U M**

Before the Court is Defendant Hamilton County Board of Education's ("Defendant") motion for summary judgment (Court File No. 18). Plaintiff Gary Bloodsaw ("Bloodsaw") responded in opposition to Defendant's motion (Court File No. 20) to which Defendant replied (Court File No. 24). Bloodsaw, an African-American man, claims that Defendant did not promote him to head football coach at Central High School ("Central"), or later to assistant coach, because of his race. Defendant argues Bloodsaw cannot establish a prima facie case of discrimination, and, even if he could, he fails to rebut Defendant's legitimate, non-discriminatory explanations for not promoting him to head coach.

For the following reasons, the Court concludes questions of fact remain regarding Defendant's decision not to promote Bloodsaw to either of the coaching positions. Accordingly, the Court will **DENY** Defendant's motion.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant operates the public school system in Hamilton County, Tennessee, which contains sixteen high schools, including Central. Bloodsaw has been teaching in the Hamilton County school

system since the 1997-1998 school year (Court File No. 18-3, Bloodsaw Dep., pp. 22-23). Before teaching in Hamilton County, Bloodsaw taught and coached in Georgia (*id.*). Between 1984 and 1994, he taught at Duluth High School in Duluth, Georgia where he was the health and physical education teacher while he also served as an assistant football coach and head coach of the junior varsity team (*id.* at pp. 14-15). After leaving Duluth High School, Bloodsaw spent two years as the head football and head track coach at Druid Hills High School in Decatur, Georgia (*id.* at p. 18). He then worked briefly at Henderson Middle School in Decatur, where he was an assistant football coach and head track coach (*id.* at p. 21). After his stint at Henderson, Bloodsaw and his wife moved to Chattanooga, Tennessee where he was hired by Defendant (*id.* at p. 22). Throughout his time with Hamilton County, Bloodsaw has worked at Brown Middle School ("Brown"), a feeder for Central, where he teaches physical education and has held three head coaching positions in football, girls' basketball, and track (*id.*). He has also served as the head track coach at Central (Court File No. 21-2, Bloodsaw Aff., ¶ 1).

In spring 2010, the head football coaching position at Central became available and the position was posted on the website of the Tennessee Secondary School Athletic Association ("TSSAA") (Court File No. 18-5, Cooper Dep., pp. 11, 13). At the time, the only open teaching position was for drafting (*id.* at p. 13); (Court File No. 18-1, King Dep., p. 43). A panel of individuals interviewed select applicants for the position, including Bloodsaw (Court File No. 18-1, King Dep., pp. 42-43). The panel interviewed Bloodsaw, in spite of the fact that he was not certified for the vacant position, because of the close relationship he had with Central and because "it was the right thing to do" (*id.* at pp. 43-44). The panel did discuss the possibility of Bloodsaw remaining at Brown until a physical education position opened at Central (*id.* at p. 44). Although it is possible

2

for someone to teach and coach at two different schools within the system, the panel concluded that, if Bloodsaw taught at Brown and coached at Central, it would be difficult to fill Bloodsaw's current coaching position at Brown given that no new teaching position would be open (*id.*). Brown's principal also indicated he did not want to lose Brown's football coach (*id.*). The panel therefore decided not to hire Bloodsaw and instead hired Coach Montgomery, a certified drafting teacher, for the coaching position (*id.* at p. 43).

However, Defendant discovered that Montgomery's teaching license was expired and he left Central after only one year on the job (*id.* at p. 44). In 2011, Defendant sought to fill the position again. The vacancy was posted to the TSSAA website and another panel interviewed five candidates for the position, again including Bloodsaw (Court File No. 18-5, Cooper Dep., pp. 20-21). Initially the only open teaching position was in business education (Court File No. 18-6, Fomby Dep., p. 37), although the Principal Finley King hoped that a physical education position might open up in the future (Court File No. 18-1, King Dep., p. 54). The panel included Principal King; Athletic Director Brent Cooper; Assistant Principal Lesa Johnson; Gary Fomby, a science teacher; a parent representative whose son played for the football team; and a student athlete (Court File No. 18-5, Cooper Dep., pp. 26-27). Both Fomby and the parent representative were African-American and were apparently chosen at least in part to make the panel more diverse (*id.* at p. 58). Bloodsaw intimates that this decision was made because he filed an EEOC charge following the previous panel's decision to hire a white coach.

The interview panel had a number of goals in mind for Central's new football coach. Central's facilities were in need of improvement and the panel was searching for a candidate who had experience improving facilities, which necessarily included fundraising experience (*id.* at p. 56);

3

(Court File No. 18-5, Cooper Dep., p. 24); (Court File No. 18-7, Johnson Dep., p. 29); (Court File No. 18-6, Fomby Dep., p. 34). Also, the panel sought a coach who would bring stability to the program, which had seen considerable turnover in the head coaching position (Court File No. 18-5, Cooper Dep., p. 24); (Court File No. 18-7, Johnson Dep., p. 27). Prior high school coaching experience was also an important factor (Court File No. 18-5, Cooper Dep., p. 24). Bloodsaw is quick to note, however, that the actual posting on TSSAA's website did not mention any of these goals but only stated that the head coach position was open, teaching positions had not yet been determined, and interested applicants should contact Athletic Director Cooper and Principal King (Court File No. 21-1, Childress Aff., Ex. A).

After conducting an initial round of interviews, the interview panel focused on Bloodsaw, John Allen, and another candidate (Court File No. 18-1, King Dep., p. 58). Allen is certified to teach business education (*id.* at p. 22), although he was not teaching when he was hired (Court File No. 18-2, Allen Dep., pp. 13-14). At the time of the interview, Allen was in his fifth year as director of development and head football coach at Silverdale Baptist Academy (*id.*). He had raised $2.5 million to build new athletic facilities at Silverdale and took the football team to three straight playoffs (*id.* at p. 13). He also had previous high school coaching experience, having been head football coach at Bradley County High School for one year and head football coach at Lakeview-Fort Oglethorpe High School for four years (*id.* at pp. 9, 11). He was selected as Best of Preps Coach of the Year for the Chattanooga area (*id.* at pp. 10-11). Before serving as head coach, he was a high school assistant coach for a number of years (*id.* at pp. 8-9).

After interviewing the three final candidates a second time, the interview panel unanimously

4

chose Allen, who is white,[1] as Central's head football coach (Court File No. 18-1, King Dep., p. 58-59). Allen was chosen because he had recent high school coaching experience whereas Bloodsaw's high school experience occurred many years prior (*id.* at p. 62). Allen's proven fundraising abilities and his prior success at renovating Silverdale's facilities were also major factors in the decision to chose him (Court File No. 18-5, Cooper Dep., p. 31); (Court File No. 18-6, Fomby Dep., p. 34).

However, Central was still in need of an assistant football coach. Given Bloodsaw's longstanding relationship with Central, several interview-panel members asked Bloodsaw whether he would be interested in serving as an assistant under Allen if a physical education position became available (Court File No. 18-1, King Dep., p. 63); (Court File No. 21-4, Bloodsaw Dep., p. 84-85). Bloodsaw told the panel he was not interested in being an assistant coach (Court File No. 18-1, King Dep., p. 63); (Court File No. 21-4, Bloodsaw Dep., p. 84-85). Principal King asked Bloodsaw to consider the position (Court File No. 18-1, King Dep., p. 63). Bloodsaw later changed his mind after speaking to another track coach who noted that physical education positions rarely become available (Court File No. 21-4, Bloodsaw Dep., p. 85). A short time after the panel initially mentioned the assistant coach position, Bloodsaw called Principal King to tell him he was interested (*id.*). Bloodsaw then met with Principal King and Cooper, who encouraged him to speak to Allen about the position, which Bloodsaw did (*id.*).

Around this time, Allen's acquaintance from Rhea County, Jerry Cook, contacted Allen to congratulate him on obtaining the position at Central (Court File No. 18-8, Cook Dep., pp. 12-13).

---

[1] Bloodsaw describes Allen as white. In some of the depositions, counsel intimated Allen may not actually be white (Court File No. 21-4, Bloodsaw Dep, pp. 60-61) ("Would it surprise you to know he's not white?"). Defendant does not dispute, however, that Allen was not a member of the same protected class as Bloodsaw.

Cook, who is white, had previously served as an assistant football coach at Rhea County High School and was the head football coach at Spring City Middle School before that (*id.* at pp. 9-10). Like Bloodsaw, Cook was certified to teach physical education and wellness (*id.* at p. 8). Allen was an assistant coach at Rhea County High School when Cook was on the team, although they did not know each other particularly well (*id.* at p. 27). Allen asked Cook if he would be interested in an assistant coach position at Central should one become available (*id.* at p. pp. 12-13). Cook said he would be (*id.*). After his conversation with Allen, Cook began assisting with spring practice at Central for which he was not compensated (*id.* at p. 13, 16). Cook was hoping a physical education position might become available, although there was not one available at the time (*id.* at p. 19).

Finally, in summer 2011, the physical education position at Central became available when a teacher resigned at the end of the school year (Court File No. 18-4, Murray Dep., p. 44); (Court File No. 18-6, Fomby Dep., p. 60). The teacher was a science instructor and Central lost the position when he left (Court File No. 18-6, Fomby Dep., p. 60).[2] After the teacher resigned, Principal King created a posting for an open physical education/weight training position at Central, which would include "coaching responsibilities" (Court File No. 18-4, Murray Dep., p. 51). Given the date this position was posted, June 30, 2011, Bloodsaw could not apply for it because a current employee may not transfer within the school system past June 1 (*id.* at p. 16). Cook filed an online application for the newly open position and interviewed with Principal King (Court File No. 18-8, Cook Dep., p. 20). Cook accepted the position in July 2011 (Court File No. 18-4, Murray Dep., p. 48). However, positions that become available after May 15 are considered temporary and must be reposted the

---

[2] Patty Murray, who is the human resources operation coordinator, testified that the teacher was a physical education teacher (Court File No. 18-4, Murray Dep., p. 44). However, the parties appear to agree that the resigning teacher was a science instructor.

next year so that current employees may apply (*id.* at p. 16). Because the Central position was posted past this date, the position was temporary and was to be reposted the following year (*id.* at p. 45). Cook reapplied the next year and was offered the permanent position (*id.* at p. 53).

On December 15, 2011, Bloodsaw filed a complaint of racial and national origin discrimination against Defendant with the EEOC (Court File No. 1-1). The EEOC charge alleges that Bloodsaw has been "continually denied promotion opportunities and employment assignments for coaching positions," and that lesser-qualified applicants who are not members of a protected class have been hired instead. His charge focuses on the 2011 hiring of Allen as head coach as well as the 2011 hiring of Cook as an assistant coach. On September 28, 2012, Bloodsaw received a notice of right to sue from the EEOC. He filed suit in this court on December 21, 2012, alleging that Defendant violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.*[3]

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,

---

[3] Additionally, Bloodsaw alleges that Defendant engages in a discriminatory pattern and practice by which it hires white coaches at predominately white schools and African-American coaches at predominately African-American schools. Defendant argues Bloodsaw may not rely on this evidence. Because the Court denies summary judgment on other grounds, it need not address this issue.

7

587-88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the Court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. DISCUSSION

A plaintiff will prevail on his Title VII claim if he "establish[es] that the defendant had a discriminatory intent or motive for taking a job-related action." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012) (quoting *Ricci v. DeStefano*, 557 U.S. 557 (2009)). "The plaintiff may show this discriminatory intent through the use of either direct or circumstantial evidence." *Id.* "The direct evidence and circumstantial evidence paths are mutually exclusive; the plaintiff can meet [his] burden with either method of proof." *Weberg v. Franks*, 229 F.3d 514, 522-23 (6th Cir. 2000).

A circumstantial racial discrimination claim is evaluated using the familiar burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under the *McDonnell Douglas*

framework, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002). A "[p]laintiff's burden with respect to establishing a prima facie case is not onerous." *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 377 (6th Cir. 1984) (citation omitted).

Once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory explanation for its actions. *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003) (citing *Burdine*, 450 U.S. at 253). Finally, the burden shifts back to the plaintiff to demonstrate the employer's explanation is pretext. *McDonnell Douglas*, 411 U.S. at 802-04, 807. Throughout this burden shifting, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also DiCarlo v. Potter*, 358 F.3d 408, 414-415 (6th Cir. 2004). The plaintiff cannot rely purely on "mere personal belief, conjecture and speculation" as they are insufficient to support an inference of discrimination. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (internal alteration omitted).

Bloodsaw's complaint alleges two instances of discrimination: Defendant's failure to hire or promote him to head football coach at Central and Defendant's failure to hire or promote him to assistant football coach at Central. Because these two alleged discriminatory acts require consideration of different facts, the Court will address them separately.

**A. Head Coach Position**

Bloodsaw claims he did not receive the head coach position at Central because of his race. Initially, Defendant argues Bloodsaw's claim must be considered a failure-to-promote rather than

9

a failure-to-hire claim.  Either way, Defendant argues, Bloodsaw cannot establish a prima facie case of discrimination.  Even if he could, Defendant contends that Bloodsaw is unable to impugn as pretext Defendant's legitimate, non-discriminatory reason for hiring Allen.

### 1. Prima Facie Case

The first issue the Court must resolve is whether Bloodsaw's claim is based on Defendant's failure to hire or failure to promote him.  Defendant argues Bloodsaw brings a failure-to-promote claim and points to Bloodsaw's EEOC charge which explicitly faulted Defendant for denying him "promotion opportunities and employment assignments for coaching positions."  Bloodsaw, for his part, argues that the failure-to-hire analysis is more appropriate in this case because the Tennessee Supreme Court has described coaching positions as separate from teaching positions and has characterized a change in a coaching assignment as a "transfer."  *See Lawrence Cnty. Educ. Ass'n v. Lawrence Cnty. Bd. of Educ.*, 244 S.W.3d 302, 314 (Tenn. 2007) (describing "[a] shift of a tenured teacher with athletic coaching duties to a full-time teaching position" as a "transfer" rather than a "dismissal or suspension").

However, the Sixth Circuit has stated that, "where an employee wants to transfer to a new position within the same organization, . . . the employee [must] show that the transfer would have been a promotion." *Moore v. City of Columbus*, 129 F. App'x 978, 981 (6th Cir. 2005).  When an employee seeks a transfer within the same organization that "would have provided an increased salary, significantly changed responsibilities, a more distinguished title, or a gain in benefits," *id.* at 981-82 (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004)), the employee's claim is based on a failure-to-promote theory.  Indeed, "an employee's subjective preference for one position over another is insufficient to render the denial of a purely lateral transfer an adverse

10

employment action under the discrimination provision of Title VII." *Momah v. Dominquez*, 239 F. App'x 114, 124 (6th Cir. 2007). Because Bloodsaw in this case concedes he was essentially seeking a transfer,[4] the Court must consider his claim under the failure-to-promote standard.

This is a matter of no small significance. To establish a prima facie case of discrimination in the failure-to-hire context, Bloodsaw would be required to show "(1) he is a member of a protected class, (2) he applied for and was not hired for a job, (3) he was qualified for the job, and (4) a similarly-situated person who was not in the plaintiff's protected class was hired for the job." *Perkins v. Harvey*, 368 F. App'x 640, 644 (6th Cir. 2010) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003)). On the other hand, to establish a prima facie case in the failure-to-promote context, Bloodsaw must demonstrate "(1) []he is a member of a protected class; (2) []he applied for and was qualified for a promotion; (3) []he was considered for and was denied the promotion; and (4) *an individual of similar qualifications* who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied." *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 240 (6th Cir. 2005) (emphasis added) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000)); *see also Scola v. Publix Supermarkets, Inc.*, – F. App'x –, No. 12–6458, 2014 WL 756708, at *10 (6th Cir. Feb. 27, 2014) ("[I]n a failure-to-promote case, Plaintiff must show not only that she was qualified, but that she was *similarly* qualified to the employees who were promoted in her stead.").

The last prong in the failure-to-promote analysis requires Bloodsaw to establish more than

---

[4] There appears no dispute among the parties that the high school head coach position would constitute a promotion over the middle school head coach position. For instance, a high school head coach receives higher supplemental pay than does a middle school head coach (Court File No. 18-3, Bloodsaw Dep., p. 113).

11

would the failure-to-hire analysis: he must demonstrate he had similar qualifications to Allen.[5] "[I]n order to satisfy the fourth prong of the *prima facie* burden in a failure to promote case, it is incumbent upon the plaintiff to establish that []he and the non-protected person who ultimately was hired for the desired position had similar qualifications." *White*, 429 F.3d at 242. In conducting this analysis, "[s]ome comparison between [Allen and Bloodsaw] is therefore necessary." *Id.* at 243. This is "not the sort of close comparison that might include consideration of the employer's evaluation of subjective traits or other details about why the non-protected person was in fact selected over the plaintiff," *id.* at 242 n.6, but Bloodsaw must demonstrate that he had "similar qualifications" to Allen, *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011).

In conducting this analysis, it is important for the Court to consider Bloodsaw's qualifications independently of Defendant's proffered non-discriminatory explanation for hiring Allen and "must not conflate the prima facie and pretext stages of the *McDonnell Douglas* test." *Provenzano*, 663 F.3d at 813. Thus the Court conducts a "general weighing" of the qualifications in a "light review" rather than the "more rigorous" comparison conducted at the pretext stage. *Id.* at 813-14. The Court must walk a fine line in this inquiry and be careful to consider Bloodsaw's and Allen's relative qualifications but not the substance of Defendant's non-discriminatory explanation for choosing Allen. In fact, the Sixth Circuit has described "this careful distinction [a]s especially necessary in cases such as this one, where the employer asserts as its nondiscriminatory reason for failing to promote the plaintiff that it chose to hire a candidate it considered more qualified." *Id.* at

---

[5] Defendant does not appear to dispute that Bloodsaw has met the first three prongs of both prima facie cases: Bloodsaw is an African-American man and therefore is a member of a protected class, he applied for and did not receive the head coach position at Central, and he was qualified for the position. But Defendant does dispute that Bloodsaw meets the fourth prong in the failure-to-promote analysis.

12

814.

Bloodsaw has been teaching and coaching since 1984, and has been doing so in the Hamilton County school system since the 1997-1998 school year (Court File No. 18-3, Bloodsaw Dep., pp. 14, 22-23). Prior to coming to Hamilton County, Bloodsaw spent two years as the head football and head track coach at Druid Hills High School, and served as head coach for the junior varsity team at Duluth High School (*id.* at p. 18). At Brown, Bloodsaw has held three head coaching position, including in football (*id.*) and served as the head track coach at Central (Court File No. 21-2, Bloodsaw Aff., ¶ 1). Allen, for his part, spent five years as director of development and head football coach at Silverdale (Court File No. 18-2, Allen Dep., pp. 13-14). He also had five years' previous head football coaching experience at two different high schools (*id.* at pp. 9, 11). And, as noted, he was selected as Best of Preps Coach of the Year for the Chattanooga area (*id.* at pp. 10-11).

The Court concludes Bloodsaw has presented sufficient evidence to permit a reasonable trier of fact to conclude that he and Allen were similarly qualified for the head coach position. *Provenzano*, 663 F.3d at 814 ("A comparison of Provenzano and Babcock reveals that Provenzano presented sufficient evidence to permit a reasonable trier of fact to conclude that she and Babcock were similarly qualified for the position of assistant manager."). In reaching this conclusion, the Court bears in mind that the prima facie case is not designed to be difficult to establish, and the Court must be cautious about conflating the prima facie and pretext stages of analysis. *Id.* at 813-14 ("[T]his evaluation must be conducted independently of [the employer's] proffered nondiscriminatory reason and must not conflate the prima facie and pretext stages of the *McDonnell Douglas* test. An important function of the prima facie test is to eliminate the most common

13

nondiscriminatory reasons for the employer's action.") (internal citation omitted). Bloodsaw has established a prima facie case of discrimination.

### 2. Pretext

At this stage, the burden shifts to Defendant to articulate a legitimate, non-discriminatory explanation for not promoting Bloodsaw. Defendant has done so: Allen had more experience as a high school football coach, had more experience and proven success fundraising to improve athletic facilities, and Allen was capable of filling an open position at Central. Bloodsaw, on the other hand, had limited fundraising experience and had not coached on the high school level for seventeen years. Moreover, there was no vacant teaching position at Central that Bloodsaw was certified to fill. As a result of these circumstances, and not because of Bloodsaw's race, Defendant chose Allen to fill Central's head coach position. This explanation is "clear and reasonably specific" and is supported by "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision [was] not motivated by discriminatory animus." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392 (6th Cir. 2008) (quoting *Burdine*, 450 U.S. at 257-58) (internal quotation marks omitted). Thus Defendant has met its burden.

The burden now shifts back to Bloodsaw to demonstrate that this non-discriminatory explanation is pretext for discrimination. "[T]he burden of producing evidence of 'pretext' essentially merges with the burden of persuasion, which always lies with the plaintiff." *Gragg v. Somersett Technical Coll.*, 373 F.3d 763, 768 (6th Cir. 2004) (citation omitted). To establish pretext, Bloodsaw must show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dep't of Human Serv.*, 668 F.3d 826, 839 (6th

14

Cir. 2012) (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

Bloodsaw argues these non-discriminatory explanations are insufficient to motivate Defendant's actions for a number of reasons. Bloodsaw first responds to Defendant's argument that Allen was better qualified because of his fundraising experience. The job posting, Bloodsaw argues, did not mention fundraising as a prerequisite and Bloodsaw suggests fundraising is not a traditional duty of Central's head coach (Court File No. 21-2, Bloodsaw Aff., ¶ 6). Next, Bloodsaw attempts to minimize Allen's advantage when it comes to high school experience, noting Allen's experience came most recently at a private school. Moreover, his longest stint as a head coach at a public high school was in Georgia, and he had only one year's experience at a public high school in Tennessee. Bloodsaw also repeatedly minimizes the importance of hiring a coach who could fill a teaching position at Central. After all, in the Hamilton County system a coach may teach at one school and coach at another (Court File No. 21-9, King Dep., pp. 28-29). Bloodsaw already coaches one sport (track) at Central while teaching at Brown (Court File No. 21-4, Bloodsaw Dep., pp. 27-28). Finally, Bloodsaw highlights some of his own qualities that Allen does not possess: Bloodsaw was more likely to be a long-term, stabilizing coach for Central's football program; he had greater familiarity with the program and the players, parents, and community; and he had long expressed an affinity for and pride in the program.

The Court agrees with Bloodsaw that he has established a question of fact. At bottom, Bloodsaw denies that the qualifications Defendant cites in support of its employment decision were ever actually considered by Defendant. Although Defendant offers testimony of its employees who discuss what was considered by the interview panel, the Court must consider the evidence in a light most favorable to Bloodsaw. As far as Bloodsaw was concerned, Defendant was primarily seeking

a candidate who would bring stability to the program. Only after Bloodsaw filed suit did Defendant raise these other considerations. And Bloodsaw has good cause to question this proffered explanation: Bloodsaw was brought in twice for an interview and was one of the final candidates considered. If Bloodsaw was so unqualified, it is curious that the interview panel would include him among the final three candidates. This is particularly true for the alleged requirement that the head football coach fill a vacant teaching position at the school. Bloodsaw was a final candidate for the position yet was never capable of filling the only vacant position available at the time. The questions raised by these explanations are sufficient to create a question of fact.

Accordingly, the Court concludes that Bloodsaw has established a question of fact with regard to the head coach position. Defendant's motion will be **DENIED** on this ground.

### B. Assistant Coach Position

Bloodsaw also argues Defendant discriminated against him when it chose Cook for the assistant coach position. As noted above, to establish a prima facie case of discrimination for a failure to promote,[6] Bloodsaw must demonstrate "(1) []he is a member of a protected class; (2) []he applied for and was qualified for a promotion; (3) []he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected

---

[6] Again, Bloodsaw is seeking a different position within the same organization and his claim must be analyzed as a failure to promote. As noted, "where an employee wants to transfer to a new position within the same organization, . . . the employee [must] show that the transfer would have been a promotion." *Moore v. City of Columbus*, 129 F. App'x 978, 981 (6th Cir. 2005). Bloodsaw must show the assistant coach position "would have provided an increased salary, significantly changed responsibilities, a more distinguished title, or a gain in benefits." *Id.* at 981-82. Bloodsaw's "subjective preference for one position over another is insufficient to render the denial of a purely lateral transfer an adverse employment action under the discrimination provision of Title VII." *Momah v. Dominguez*, 239 F. App'x 114, 124 (6th Cir. 2007). Bloodsaw has not pointed to any such evidence. Defendant, however, did not argue the assistant coach position would not constitute a promotion and the Court therefore will not rule in its favor on this ground.

16

class received the job at the time plaintiff's request for the promotion was denied." *White*, 429 F.3d at 240.

Defendant argues, as it did above with regard to the head coach position, that Bloodsaw and Cook did not have "similar qualifications." Cook was a head coach on the middle school level for ten years before serving as an assistant football coach at Rhea County High School (Court File No. 18-8, Cook Dep., pp. 9-10). Although Bloodsaw has previous high school experience, Cook's experience on the high school level was much more recent. Defendant argues this more-recent experience precludes Bloodsaw from demonstrating he and Cook had similar qualifications. However, the Court concludes Bloodsaw has presented sufficient evidence to permit a reasonable trier of fact to find that he and Cook were similarly qualified for the head coach position. *Provenzano*, 663 F.3d at 814. Bloodsaw had nearly twice as much coaching experience as Cook. Although Cook's high school level experience was more recent, Cook and Bloodsaw had sufficiently similar levels of experience. Bloodsaw has established a prima facie case of discrimination.

Consistent with the burden-shifting framework, Defendant has articulated a number of legitimate, non-discriminatory explanation for choosing Cook: Allen was uncomfortable with Bloodsaw because he felt that Bloodsaw wanted the assistant position so that he might one day take over the head coach position; Cook had much more recent experience on the high school level; Cook had volunteered to assist in spring practice without the promise of a position; and Cook could fill a teaching vacancy at Central whereas Bloodsaw was precluded from obtaining the position.

As he did with the head coach position, Bloodsaw attacks each of these non-discriminatory explanations. First, Defendant's argument that Allen felt Bloodsaw wanted his job is the subject of

17

some dispute. At Principal King's behest, Bloodsaw and Allen met to discuss the assistant coach position. According to Bloodsaw, the two spoke about football and about which positions he could coach, but Allen ultimately told him there was another person from Rhea County whom Allen wanted to hire (*id.* at pp. 86-87). Allen, on the other hand, remembers the conversation quite differently. Allen recalls asking Bloodsaw if he could coach at the high school and teach at the middle school since there was not currently an available physical education position (Court File No. 18-2, Allen Dep., p. 56). Bloodsaw indicated he could not do that because Brown would need his position (*id.*). Allen also testified that Bloodsaw told him he wanted to be at the high school so that, when the head coaching position became available again, he would be in a position to take it (*id.*). Allen told him he did not plan on leaving in the near future and thought it was an odd thing for Bloodsaw to say (*id.* at pp. 56-57). Bloodsaw specifically disputes he said anything about seeking the head coach position (Court File No. 21-4, Bloodsaw Dep., pp. 87-88).

Bloodsaw also minimizes the importance of Cook's more recent high school coaching experience. Bloodsaw has more overall coaching experience and, as was true with Allen, was more familiar with Central and its community and would bring more stability to the program.

Finally, Bloodsaw disputes whether he was barred from filling the vacant physical education position. Defendant argues the vacancy was not created until a teacher unexpectedly resigned after the date for internal transfers (Court File No. 18-4, Murray Dep., p. 16). Bloodsaw, however, suggests Principal King knew the teacher would resign before the transfer deadline. Bloodsaw relies on deposition testimony of Fomby, head of the department from which the teacher resigned, who testified the teacher left at the end of the school year and that it "seemed like" it was the end of May (Court File No. 21-7, Fomby Dep., pp. 59-61). Bloodsaw was also under the impression there would

18

be an open physical education position during this time period.

As it did with the head coach position, the Court concludes Bloodsaw has demonstrated that a question of fact exists. There are clear disputes of fact regarding what occurred during Allen's and Bloodsaw's conversation. Moreover, Bloodsaw again disputes whether the "more recent" high school experience was a legitimate hiring factor. Not only is there some dispute about the date that the physical education position became vacant, but Principal King had intimated to Bloodsaw that such a position may become available. Further, he encouraged Bloodsaw to speak with Allen about the position. If filling a vacant position at Central was such a crucial qualification, it is difficult to understand why Principal King would have encouraged Bloodsaw to apply for the position.

Accordingly, the Court concludes a question of fact exists regarding the assistant coach position and will **DENY** Defendant's motion on this ground.

## IV. CONCLUSION

For the foregoing reasons, the Court will **DENY** Defendant's motion for summary judgment (Court File No. 18).

**An Order shall enter.**

/s/
**CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE**